Assigned Estates of Robert Hare Powel & Co. and Robert Hare Powel's Sons & Co. Appeal of Brisbin et al., trading as Houtzdale Bank. South Western Nat. Bank's Appeal.

*Assignment for benefit of creditors — Removal of assignee — Practice — Master — Act of June 14, 1836.*

Under the act of June 14, 1836, P. L. 630, relating to the dismissal of assignees for the benefit of creditors, the court may appoint an examiner to take testimony, but has no authority to appoint a master to report upon the facts. The petitioning creditor in such a case has the right to the best judgment of the court on his proofs, uninfluenced by the opinion of any other person.

It seems that where an auditor has filed a report upon the account of an assignee for the benefit of creditors, and has fully considered the question of the integrity of the assignee in managing the estate, it is improper for the court to entertain a petition for the dismissal of the assignee, before acting upon exceptions to the auditor's report.

*Appraisement of assigned estate.*

Appraisers appointed to appraise an estate assigned for the benefit of creditors, should not appraise mining leaseholds and manufacturing plants at a value which they probably would have if operated with great skill and large capital, but at the price which the properties would probably bring at a fair sale.

Where an assigned estate has been greatly overvalued by the appraisers, without the assignee being a party to the overvaluation, it is no ground for dismissing the assignee that he subsequently sold the property for what it was actually worth.

*Equity—Master's fee—Payment before filing report.*

A master should not, before he has filed his report, accept his fee in whole or in part from one of the parties without the knowledge of the other, or of the court. If the litigation is prolonged, the master has a right to ask a direction of the court for immediate payment of a proportionate part of his fee. If no such request is made to the court, payment should only be made to the master with the knowledge and by consent of counsel for all parties interested.

*Equity—Proceedings to dismiss assignee—Costs.*

Where upon a petition for the dismissal of an assignee for the benefit of creditors, the court finds that the averments of the petition are not sustained, but also finds that they were not groundless, the costs will not be imposed upon the petitioner, but upon the assigned estate.

*Assignment for benefit of creditors—Distribution—Composition—Payment to creditors to manage business—Exceptions.*

The unsecured creditors of an assigned estate formed a corporation for the purpose of taking a conveyance of a portion of the assets of the estate. The assignee conveyed to the corporation some of the real property of the estate, and also paid to the corporation a large sum of money to be used as a working capital. All of the creditors agreed to the transaction. The corporation turned out a failure. The assignee filed an account in which credit was taken for the conveyances and payments made to the corporation. The report of the auditor allowing the credit was confirmed absolutely. When the assignee filed the second account one of the creditors claimed that the assignee should be surcharged with the payment made to the corporation. It appeared that this creditor had been represented by counsel at the first audit, and that he had actively participated in the meeting of the creditors leading to the transfer of the property, and that he knew of the cash payment to the corporation. *Held,* that there was no ground for surcharging the assignee with payments made to the corporation.

In such a case the objecting creditor cannot claim that the agreement was invalid because some of the creditors, acting in a fiduciary capacity, had no authority to join in it.

*Assignment for benefit of creditors—Accounts—Res judicata.*

An assignee for the benefit of creditors in a second account claimed a credit for a certain sum because in the first account credit to that amount had been taken for commissions and counsel fees, in excess of cash on hand. *Held,* that such a claim was in effect an admission that there had been no final adjudication of the correctness of the credits claimed for counsel fees and commissions, and that their correctness could be considered at the audit of the second account.

*Assignee for benefit of creditors—Commissions.*

An assignee for the benefit of creditors is not entitled to commissions upon an excessive overvaluation of the assigned estate, but only upon the real value of the estate.

The assignee is not entitled to double compensation in any case; if duties usually performed by an assignee personally have been delegated to lawyers and agents, and compensation has been allowed for their service, he cannot again charge for such service, as if rendered by himself.

Argued Jan. 22, 1894.    Appeals, Nos. 330, 399, Jan. T., 1893, from various orders of C. P. No. 3, Phila. Co., June T., 1887, No. 796, in assigned estates.    Before STERRETT, C. J., WILLIAMS, McCOLLUM, MITCHELL and DEAN, JJ.    Reversed in part.

Exceptions to auditor's report. . Petition for dismissal of assignee.

The facts appear by the opinion of the Supreme Court.

The court below, GORDON, J., sustained the following among other exceptions of the assignee to the auditor's report on its second account:

" 4. In reporting that the approval of this court of the item of $75,000, commission and counsel fees, which was claimed at the audit of the first account and reported favorably by the auditor, and which has since been confirmed absolutely by this court, must be regarded as unadjudged as to $62,586.06 thereof." [1]

" 5. In reporting a recommendation that the accountant be now surcharged in the amount of $62,586.06, part of an item of $75,000 passed upon and approved on the audit of the first account, and confirmed by this court." [2]

" 7. In sustaining the objection to the offer of the accountant of exhibits purporting to be the agreements of all the creditors of the assigned estate, save those whose claims were less than $350 in amount, to a settlement of the estate as per the credits claimed in the transfer of property to the Powelton Iron Co." [3]

" 15. In reporting that the findings of the auditor upon the first account were quite invalid on the ground that a misunderstanding was produced by that account.    There was no evidence that any one was misled by that account, nor has any one but the Houtzdale Bank attacked it; and even if this had been otherwise it was not within the scope of the powers of the present auditor to consider the question and pass upon it." [4]

" 20. In ruling that the transfer of property to the Powelton

Iron Co. should be disallowed, because, in order to show it valid, it was necessary to prove that all creditors, without exception, secured or unsecured, assented to it, after having overruled the offer of the accountant to show that all such creditors, secured and unsecured, had assented, save only those who by the agreement of the others were to be paid in cash." [5]

"21. In reporting that the assigned estate of Chipman & Holt is not bound by its signature to the contract. This estate was so bound by the signature of John I. Rogers, Esq., assignee, to which the auditor refers; it was also bound by the signature of Chipman & Holt to contracts which were among those excluded by the auditor in overruling the accountant's offer to prove as above noted; it has, moreover, been found by the assignee that there is no indebtedness to Chipman & Holt. They are not creditors." [6]

"25. In reporting that the item of $10,000 in cash paid as a commission to the agent who secured the extension of the first and second mortgage debts for a period of five years, was, in fact, a bonus, though stated as paid by way of commission. This item was not a bonus, but was a commission. It was important to the unsecured creditors that the secured creditors who held bonds secured by mortgages by virtue of which the entire estate could be swept away, should agree to hold their hands for a period of five years, and this agreement was procured from them by the agency of a broker, to whom a commission was paid upon the authority of the committee of the unsecured creditors, this committee comprising the seven corporators of the Powelton Iron Co." [7]

"31. In disallowing for purposes of the present audit the entire credit claimed upon the account as the appraised value of Sterling No. 1 lease and equipment." [8]

"33. The learned auditor has erred in reporting that the claim of the First National Bank of Huntingdon constitutes an additional cause upon new and independent ground why the credit item of $2,313,218.89 appraised valuation of assets conveyed to the Powelton Iron Co., should be disallowed." [9]

*Errors assigned* by the Houtzdale Bank, appellant, were the action of the court (1–9) in sustaining above exceptions, quoting them; (10) in confirming the second account as filed without

giving the Houtzdale Bank a hearing on the assignee's and on its own exceptions; (11) in confirming the second account as filed although the auditor's report was interlocutory only, and no awards were made, whereby an audit thereof was made impossible; (12) in confirming the second account as filed, although an exception had been filed by the assignee to so much of the report of the auditor as disallowed a credit for $268,998 contained therein for appraised value of Ramey lease and improvements, whereby said credit was restored to the account and finally allowed; (13) in sustaining the assignee's exception to the report of the auditor that Mr. Crawford had no right to accept service of the filing of the first report for the Houtzdale Bank; (14) in sustaining the assignee's exception to report of the auditor that the Houtzdale Bank was entitled to a review of the audit of the first account.

*Errors assigned* by the South Western Bank, the Houtzdale Bank et al., sur petition to remove assignee, were, among others, dismissal of exceptions to master's report, confirmation of report, dismissal of petitions for removal of assignee, imposition of costs, and allowance of master's fee.

*James W. M. Newlin* and *Mayer Sulzberger*, for appellants.— The assignee's first account should be reviewed.

The surcharge of $313,218 for property unlawfully conveyed to the Powelton Iron Co. should have been sustained. Unanimous consent was wanting: Artman v. Truby, 25 W. N. 163.

The surcharge of $62,586.06 counsel fees and commissions should have been sustained.

The appraisement at about three times the indebtedness should in itself have invoked inquiry upon the part of the assignee company when it knew that on the basis of it the assignors were seeking an extension.

The master's appointment was unauthorized.

Awards will be set aside where the arbitrator uses strong expressions against either party which may indicate a strong prejudice: Burton v. Knight, 2 Vern. 515; Kampshire v. Young, 2 Atk. 155; Lingood v. Croucher, 2 Atk. 396; Chicot v. Lequesne, 2 Ves. Sr. 315; Ormes v. Bendel, 2 Giff. 166; Mercier v. Pepperwell, L. R. 19 Ch. Div. 58; Redman's Arbitration and

Awards, 200; Com. v. Kelly, 9 Phila. 586; Com. v. Halloway, 44 Pa. 219; Mitchell v. Kintzer, 5 Pa. 216; Lewis's Ap., 91 Pa. 362.

All the proceedings, viz, the unfinished audit of the second account of the assignee and the removal petitions, were under the act of June 14, 1836, P. L. 630, Purdon, 1649, et seq. This act gives no costs, and consequently none can be taxed. Costs are purely statutory: Stewart v. Baldwin, 1 P. & W. 461.

*John G. Johnson, W. W. Wiltbank* with him, for appellee.— Every creditor other than the Houtzdale Bank assented to the transfer, and such objection as is advanced by the Houtzdale Bank is wholly inconsistent with its agreement as a creditor and with its course at the first audit, when the transaction was expressly passed upon at the request of its counsel. As it now denies that it was represented by counsel we may add that its agreement as a creditor must bind it: Burke's Est., 1 Parsons, 470; Randolph v. Quidnick Co., 135. U. S. 457; Crans's Ap., 9 Atl. R. 282; Guiterman v. Landis, 1 W. N. 622; Boyd v. Smith, 128 Pa. 205.

No sufficient grounds were shown for removing the assignee: During's Ap., 13 Pa. 234.

The costs to the utmost extent should be put upon the petitioners.

*James W. M. Newlin,* for appellants, in reply.—Artman v. Truby, 25 W. N. 163, is conclusive on the necessity for unanimous consent. Here it was held that a party who sets up a composition of creditors to defeat a clear legal liability must prove performance of every condition on which the effect of composition is limited.

McLellan's Ap., 76 Pa. 232, shows clearly the right to scrutinize the first account.

In Boyd v. Smith, 128 Pa. 205, the element of fraud is wanting, and the creditor who had freely accepted a composition with full knowledge of the facts was not allowed, on a pure technicality, to defeat a fair settlement. So also in Guiterman v. Landis, 1 W. N. 622, there was no fraud. The case depends on its own special facts, which were left to the jury, and they found the facts which estopped the plaintiff claiming against

the trust.   Burke's Ap., 1  Parsons, 470, was predicated upon the ground that the action of the trustee had been bona fide.

## HOUTZDALE BANK'S APPEAL.

OPINION BY MR. JUSTICE DEAN, Oct. 1, 1894 :

On 29th August, 1887, the partnership of Robert Hare Powel and Company, and Robert Hare Powel's Sons and Company, made assignments for the benefit of creditors to the Guarantee Trust and Safe Deposit Company.   The assets of the assignors were made up principally of iron ore lands, coal lands, collieries, one large blast furnace in operation, and another approaching completion.   These properties were located in Allegheny, West-moreland, Bedford, Clearfield and Huntingdon counties.   The assets, with some others of less value, were appraised by appraisers appointed by the court at $4,300,000.   The liabilities, principally liens on real estate and maturing negotiable paper, were, approximately, more than $1,500,000.   Apparently, the value of the assigned estate was sufficient to pay at least twice the indebtedness.   But, after three years administration of the trust by the assignee, the accounts filed showed such a dwindling from the appraised value, that all the unsecured debts, in the most sanguine view, were in peril.

On January 24, 1889, the assignee filed its first account, to which exceptions were filed by several of the creditors, among them the Houtzdale Bank, this appellant.   The balance, as shown by the account filed, was $3,780,755.93.   The auditor did not sustain any of the exceptions to the account, nor did he make any distribution, except to counsel for fees, agents for commissions, costs and expenses of audit, amounting to $7,146.47, which, added to appraised value of properties conveyed by assignee to Powelton Iron Company, $2,313,318.89, left an apparent balance of $1,460,290.57 on this first account, still in hands of accountant.

The basis of this large credit to the assignee, as stated by the auditor, was as follows :

" The firm of Robert Hare Powel's Sons and Company, prior to the assignment, had conducted the business of the manufacturing and sale of iron, and the firm of Robert Hare Powel and Company had carried on the business of mining and shipping coal.   The affairs of both firms, particularly the latter, were

upon an extremely large scale.   The assignment occurred on the twenty-ninth day of August, 1887.   Shortly afterwards, the creditors of the two firms organized, and appointed a committee to represent them in advising the conduct of the assigned estates. A number of meetings were held by this committee to assist the judgment of the assignee.   In pursuance of their recommenda-tions, the business of both firms was continued by the assignee through the medium of the partners as agents, until the end of the year 1888.   The creditors were of two classes.   Two sets of loans, aggregating nearly $500,000, issued by the iron firm and secured by mortgages upon the iron plant, were outstand-ing at the time of the assignment.   There were also several me-chanics' liens filed in Bedford county..   One class of creditors were the holders of these bonds and of the said liens.   The second class was unsecured.   It consisted of the other creditors in general.   The property assigned consisted of a large iron manufacturing plant and extensive coal lands and leases.

" At length the following arrangement was reached, and was joined in by all the creditors who could be ascertained.   The assured creditors agreed to an extension of five years upon the terms of their loans and mechanics' liens.   The unsecured creditors formed a corporation under the laws of Pennsylvania, to which they gave the name of the Powelton Iron Company, with a capital of $1,000,000.   To this company $100,000 in cash was to be paid, and a transfer made of the iron plant and various other properties which belonged to the assigned estates, estimated to be worth not less than $900,000 above the mort-gage.   This stock was to be taken by the creditors in propor-tion to the amounts of their claims.   It was to be divided into twenty thousand shares of fifty dollars each.   These shares were to be accepted dollar for dollar for all unsecured claims, all odd amounts of which—less than fifty dollars—were to be paid in cash.   The remaining portion of the stock was to be transferred to the Guarantee Trust and Safe Deposit Company to be held in trust for the assignors."

Presumably, and by a note appended to the account, the bal-ance of the estate was made up of what was left of the inven-tory: Sterling Coal Mine No. 2.   Crisfield tract of coal land. Lands in Belmont county, Ohio.   Coal land in Allegheny county.   Coal land in Westmoreland county.   Powelton estate

land in Centre county.   Unpaid book accounts.   Proceeds of sale of Sterling Coal Mine No. 1.   Ramey coal lease.   By the terms of his appointment, the auditor was to " audit, settle and adjust the account filed," but an examination of his report shows that he really settled by hearing and adjudication only eight distinct matters of contention.   1. He determined that the assignee was rightfully entitled to a credit of nearly $26,000. 2. For $15,000 paid to Mrs. Amy Powel as rentals.   3. That certain boats used in transportation of coal were advantageously disposed of.    4. That the assignees had diverted no money paid for coal to payment of illegal commissions.   5. That R. B. Wigton was entitled to $2,510 as commission on sale of Sterling No. 1 mine.   6. That part of exceptants' costs and counsel fees should be paid out of the assigned estate.   7. That an allowance of $2,154.91, commissions on sale of coal cars, should be made.   8. That the property conveyed to the Powelton Iron Company was free from the trust created by the assignment.

As the first account showed still a very large portion of the assigned estate undisposed of, and there would necessarily be another accounting, the investigation of the claims of the assignee for compensation and counsel fees, at this audit, was not very thorough, nor does it seem to have been so considered by any of the parties in interest.   The principal object seems to have been, to settle by an adjudication, that the Powelton Iron Company was not answerable to the assignee for the administration and management of the property conveyed to it under the arrangements with the creditors, and that, thereafter, the creditors must look to the board of directors of that corporation, as alone answerable for the assets transferred.   We have no doubt, the auditor, on the facts before him, performed his full duty in respect of the authority conferred upon him, and the confidence reposed in him by the court.   The contending parties were represented by able counsel.   It was not the duty of the auditor to suggest new subjects of contention to them ; he was to pass upon the issues of fact and law raised by the litigants, and not upon those which might suggest themselves to him during the progress of the hearing.

The report of the auditor was filed August 12th, and confirmed absolutely August 20, 1889.   On September 6, 1889, the second account of the assignee was filed.   This was also

excepted to, and the account referred to Mr. Miller as auditor. It appeared from this account, that, in its first account, the assignee had taken credit for payment of $62,586.06 more cash than it had in its hands; a correction of this error in the second account was made by charging itself with the appraised value of unconverted assets, less that amount. The auditor properly held, this was wrong, as it, in effect, was an appropriation of assets not yet converted. Further, it appeared at the second audit that the amounts with which the assignee was charged in the account, although apparently collections in the ordinary course of business, were in large part the proceeds of sales of assets at prices far below the appraised value. In such cases, the amounts realized were added to the debit side of the account, thus swelling the appraised value by the amount of proceeds of sales, until the aggregate reached nearly $7,000,000; while the large difference between the appraised value and the price realized by conversion, even at that period of the management, showed there would not be enough money to pay the unsecured creditors.

The auditor pertinently says: "The vice of this mode of presenting the assignee's operation, consists . . . . . . not merely in formal error, but in radical and vital injury to the creditors. . . . A very careful examination of the whole account, in connection with the facts appearing at the audit, shows that these monthly items of receipts include the entire proceeds of assets sold at an enormous depreciation from the appraised value." That is, apparently, the appraised value of $4,311,579 of the assets, as shown by the inventory, had been augmented by the monthly receipts from operating the plants, month by month, during a period of seventeen months, until they reached $6,877,969.27. There is but obscure intimation in the account, that these monthly receipts were, to a large extent, from the sale or conversion of assets. This is the form of the charge for the first month of the seventeen: "1887. Sept. 30th. To amount of receipts for this month, $149,213.15." And this entry, except as to month and amount, is dittoed for each of the following months, up to the date of filing the account. And there is no real correction of this method of accounting for conversion of the assets, on the credit side of the account. The Sterling No. 1, appraised at $496,785.72, and sold for

$50,000, is itemized thus: "By appraised value of properties sold and account collected and accounted for in the receipts, Stlng. on act., $5,000." It is true, as argued by counsel for appellee, the mere fact of entering proceeds of sales on the debit side of the account is not necessarily misleading; they may be so distinguished, as to clearly identify them, and then they disclose the truth, however awkward the method. And this is the case, as to the charge in first account of appraised value of the Powelton Iron Company property. But, if the sales be entered as apparently monthly receipts from another source than sales, the account is not alone formally wrong; it is false. Not, necessarily, intentionally so, but false, because misleading.

In fact, the second account, on both sides of it, by the method of stating it, was misleading. The auditor undertook, to some extent, to reform it, as to the item of $62,586.06, by deducting this sum from a credit of $75,000, counsel fees and commissions in the first account, on the theory that, as the money to pay that item was not in the hands of the assignee at the date of the credit, it could not have been adjudicated, because not in fact paid. He, therefore, surcharges the accountant with the $62,586.06 by adding that sum to the balance brought over from the first account, making the whole $3,843,341.99, instead of $3,780,755.93. In thus treating this item, and leaving it for future adjudication, he was right. The assignee had taken up a note in the sum of $2,584.50, of the Reading Iron Works, indorsed by the assignors; the drawer became insolvent; this was also surcharged, and the item remains to be passed upon at another hearing. The auditor, for reasons stated by him, disallowed the credit of $2,313,218.89, the appraised value of the property conveyed to the Powelton Iron Company, and surcharged the assignee with this amount, to be finally adjudicated, however, on settlement of final account.

As to the sale of lease of Sterling No. 1, the auditor recommended that the contention as to that item stand over for adjudication in a subsequent accounting. He further surcharged accountant with interest on balance of funds on hand from date of assignment, to the amount of $600, for the reason that the money was mingled with the funds of the assignee's bank, and loaned indiscriminately to customers. On a restatement of the account, and adding surcharges, the balance against ac-

countant was $3,920,029.92.   No distribution was made to creditors, for the reason that sufficient notice of audit had not been given, and therefore many claims may not have been proven and presented ; and further, because of some doubt as to his authority to distribute under the terms of his appointment.   He therefore awarded the balance to accountant, to be thereafter accounted for.   A rehearing on exceptions to this report was had before the auditor before it was filed, but, except in some immaterial matters, he adhered to his adjudications, and filed his report, and exceptions were entered by both assignee and complaining creditors.

One thing appears clear, that is, that so far as concerned all the real questions in contention between the assignee and the complaining creditors, they now were substantially before the court, with the evidence bearing on them.   There were also two reports of a competent auditor, of whose ability and integrity neither party had intimated a doubt.

The litigation on the important matters tried before the auditor, with so much labor and vexation to all concerned, and at such large expense to the estate and creditors, should have been stopped just at that point, by a final judgment of the court below on the exceptions to these reports.   After tracking, step by step, the long course of litigation which followed, it seems to us but little further light was thrown on the important points in controversy, and the questions raised at the second audit continued, to the end, almost the only ones of merit in dispute.   It is not, alone, the duty of courts to decide disputed points ; it is also their manifest duty to so control the course of procedure before them, that, consistent with fair hearing, as speedily as possible, there shall be an end of strife in final judgment.

But, while the exceptions were pending before the auditor on the second account, on June 7, 1890, the Houtzdale Bank presented its petition for the removal of the assignee, and this was followed on January 10, 1891, by a like petition by the Harrisburg Bank and other creditors.   The petitions preferred fifteen distinct charges of mismanagement and dishonesty against the assignee ; all were answered by a distinct denial of record. On July 8, 1890, just a month after the first petition for removal of assignee was preferred, the second report of the auditor

was presented, to which exceptions were filed by both account-
ant and creditors.    These exceptions raised distinctly the ques-
tions of negligence and mismanagement.    Unless the estate
was in peril from the insolvency of the trustee, which was not
even intimated, it is very clear, action on the petitions should
have been suspended, to await the event of the judgment on
the exceptions to the auditor's report; but judicial action on
the reports was suspended, and the new line of litigation, hav-
ing for its object the removal of the assignee, was taken up and
pursued for nearly two years, with an acrimony seldom exhib-
ited in the records of courts.    Thomas J. Worrell, Esq., was
appointed examiner, and it was directed that all the testimony,
theretofore taken by the auditor, be laid before him.    After-
wards, the same gentleman was appointed master.    In the open-
ing language of his report, he says : " By the examiner's report,
it appears that the entire record of the Powel assigned estate
in this court, and the proofs taken at the several audits, shall
be treated as before him, in order to help him in finding the
facts, and in forming his opinion upon the case.    So that
every paper filed in the cause is now practically before the mas-
ter for his determination, and accordingly he proceeds to pass
upon them as directed."

The master, then, in a most elaborate report, proceeds to
state his findings of fact on the issues raised by the petitions and
answers for removal.    In the course of the report, he under-
takes to review, pass upon, and condemn some of the findings
of fact and conclusions of law by the auditor on the first and
second accounts.    He points out, where, in his judgment, the
auditor committed grave errors in both his facts and law.    Dur-
ing the course of the proceedings before him, the auditor had pre-
pared what is termed an " interlocutory report " for the court ;
it was intended by the suggestion in this paper, to move the
court to direct a form of notice to be given creditors, as to the
audit.    As counsel immediately agreed upon the form of notice,
this report was not presented, but is here upon the record as
one of the exhibits of the cause.    While vindicating the integ-
rity, it reflects somewhat severely on the business management
of the assignee.    The master regrets this paper was not with-
drawn and destroyed at the time counsel agreed upon the form
of notice, as it only tended to encourage litigation.    He says

of this paper : " It was unfortunately violent in its insinuations, and, as it was soon shown, unwarranted by the facts of the case, the improvident statements of which had been derived somewhat from sources beyond the regular course of the audit. . . . The proposed interlocutory report was due to a misconception of matters of fact, and to mistaken conclusions upon matters of suspicion." The master further characterizes the litigation as experimental ; speaks in a tone of disapproval of the complaining creditor for calling the respondent and its agents as witnesses, and interrogating them with a view of discrediting their answers to the petitions. After narrating the course of management, he announces this conclusion : " The master has, without difficulty, reached the conclusion that the assignee has done nothing to bring it within the provisions of the act of June 14, 1836, whereby neglect or mismanagement of a trust estate are declared to be grounds for dismissal. It has not been seriously contended at the argument, that any offence greater than neglect and mismanagement could be charged. The proof is overwhelming, that an extraordinary degree of care, and conscientious and remarkable skill in management are to be ascribed to the assignee." He then recommends that the petitions be dismissed at the costs of the petitioners.

The decree suggested by the master was adopted by the court. The material exceptions by the assignee to the report of the auditor on the second account, were sustained, and the report set aside, and the second account confirmed absolutely. From the different formal orders of the court below, the Houtzdale Bank takes no less than twelve appeals. All the questions raised by them are embraced in, and can be considered in disposing of the decree overruling exceptions to auditor's report, and confirming absolutely the first and second accounts, which is appeal No. 12 ; and from the decree overruling exceptions to the report of the master, and dismissing the petitions for the removal of the assignee, which is appeal No. 11.

The petitions for removal were presented under the 11th section of the act of June 14, 1836, which enacts that : " Whenever it shall be made to appear in a court of common pleas having jurisdiction. . . . that such assignee or trustee is wasting, neglecting or mismanaging the trust estate. . . . it shall be lawful for such court to issue a citation to such assignee or

trustee to appear before the court, at a time to be therein named, to show cause why he should not be dismissed from his trust. On the return of such citation, the court may require such security, or such other and further security, from such assignee or trustee as they may think reasonable, or may proceed at once to dismiss such assignee or trustee from the trust."

Under this act, the petitions of these appellants for the discharge of the assignee were presented. This was after two accounts had been filed by the assignee. Then followed, on January 10, 1891, petitions by other creditors for the discharge. As before noticed, in the meantime, the two accounts by the assignee, to which exceptions were filed, had been referred to E. Spencer Miller, Esq., as auditor, for adjudication; he had made two reports; in the last one, had surcharged the assignee with $2,313,218.89, and exceptions were filed to this report, which were pending, when, on January 24, 1891, Thomas J. Worrell, Esq., was appointed an examiner to take testimony. By an order of the court, made the same day, all the testimony and exhibits produced before the auditor, were directed to be treated as evidence before the examiner. Then, afterwards, the examiner is appointed master, and, as such, passes on all the evidence, and reviews the findings of the auditor.

The creditors had averred, against the assignee, illegal payments of the trust money to itself; concealment of the true value of the assets; favoritism towards the assignors in employing them at large salaries; excessive charges for commissions and counsel fees; reckless sales at grossly inadequate prices, of portions of the assets, and other charges. Whether the evidence sustained all, or any one of these averments, was solely for the court to determine from an impartial consideration of it. We are very decided in our opinion, that, under the act, the duty of consideration of the testimony, and the formation of opinion upon it, cannot be delegated by the court to any appointee. It is, doubtless, within the power of the court, and properly so, to appoint an examiner to reduce to writing the evidence offered in support of the petition, that it may be presented in an orderly form for the consideration of the judge who passes upon it; but the right to act through another, by appointment, extends no further. The petitioning creditor, then, has the right to the best judgment of the court on his

proofs, uninfluenced by the opinion of any other person on the same proofs. Here, the gentleman appointed master passes on the evidence touching every averment; discusses its relevancy and significance, and in no doubtful terms gives his opinion as to the truth or falsity of the charges. He may have been a very capable officer, and in every respect fitted to exercise the judicial function attempted to be conferred upon him, but his opinion is not what these appellants had the right, under the law, to ask on their complaint. It is the opinion of an officer wholly unknown to the law, which has prompted and framed the judgment.

Nor does the fact that the evidence on which the opinion of the master was based, was afterwards submitted to the scrutiny of the court, help the matter. This evidence went before the court, accompanied by inferences, argument and a judgment as to the fact, by one who stood as a disinterested officer. Necessarily, from the very composition of the human mind, the tendency is, to give weight to the opinion which comes before us as the result of an impartial and disinterested deliberation. The petitioners' case was prejudged before it reached the court, which alone, under the statute, had the duty of determining whether the complaint was well founded. It was error to ask the opinion of a master on a matter which was solely for the opinion of the court on the facts; to invite another to suggest a judicial decree, which the law, in effect, declared must originate in the mind of the court. As the master had no authority to tell the court what to do in reference to the discharge of the assignee, much less had he power to review the findings and conclusions of the auditor, then pending for consideration in court. Therefore, we eliminate and put to one side his opinions and take the facts bearing on the issue raised by the petition and answers. As to the auditor's report, and exceptions thereto, they must stand on the facts developed at the audit, and be adjudicated accordingly.

The prominent fact, and the one which, without doubt, suggested and to a great extent stimulated this litigation, is the gross disparity between the assets when converted and their appraised value. The appraisement of the property passing into the hands of the assignee was greatly in excess of any probable realization. The amount of the inventory was

$4,311,579.15; the actual indebtedness approached $1,700,000, made up of liens, by mortgage, judgment and mechanics' liens, about $700,000, and unsecured debts of nearly $1,000,000. As indicating how unreliable was this appraisement, as a basis of value for payment of debts, we note the Sterling No. 1 :

| | | |
|---|---:|---:|
| Appraised value, . . . | | $496,495 23 |
| Selling price, . . . | $50,000 00 | |
| Ramey lease. appraised value, | | 268,998 05 |
| Surrendered to discharge a debt of | 16,000 00 | |
| | $66,000 00 | $765,493 28 |

These two properties had been disposed of before the second account was filed, and not two years after the assignment, for less than 9 per cent of their appraised value, a loss of about 91 per cent. The blast furnaces and all the coal and ore lands appurtenant, with improvements, were valued by the appraisers at $2,313,218.19 ; they were transferred to the Powelton Iron Company for $900,000, a little over 40 per cent of the appraised value, a loss of about 60 per cent. Yet the evidence shows Sterling No. 1 was sold for the best price that could be got for it, and that the surrender of the Ramey lease, under the circumstances, was wise ; the assignee could not operate, indefinitely, a coal mine ; the minimum royalty to be paid was fast piling up a debt. The mismanagement was not in a reckless conversion of the assets at wholly inadequate prices ; it was in a reckless appraisement of them, by appointees of the court, at prices which no assignee, under a lawful management of the property, could obtain for them.

The appraisers were reputable gentlemen ; one was an iron manufacturer, having experience and knowledge of iron properties ; two of them were practical coal operators, and besides, for years before the assignment, one of them had special knowledge of the assigned coal lands. The competency of the appraisers, from everything that could be known of them when appointed, was beyond question. But, now notice from the testimony of Mr. McHugh, a coal operator for forty years, on what a radically wrong basis they proceeded to make their valuation of assets, which clamorous creditors were demanding should be turned into money and appropriated in payment of more than one and a half million dollars of debt. He testi-

fies : " We met at Saxton, and organized there, and conferred together as to the basis upon which this appraisement should be made, and we concluded that it should be made upon a practical basis ; that is, upon the basis that the business should be conducted uninterruptedly, and under skillful management, and all to be made out of it that such management could produce. . . . That was the method we settled on to make those appraisements." Further on he says, in substance, that he did not think the properties would have brought anything like the appraisement at a sale, but the valuation made was on the assumption that the creditors would take and operate the properties until their debts were paid. Mr. Coit, in his testimony as to the iron property, after speaking of the special advantages of the plant, says : " We valued it as an active plant in operation ; not as a dull, dried up, dead thing, but as a thing that was going, that was capable at that time of making money."

A man of ordinary observation, it seems to us, would have no difficulty in discerning the cause of the great disparity between the amount realized by a sale, soon after the appraisement, and this sort of " practical" value thus put upon the property by the appraisers. Take the Sterling mine ; the lease stipulated that ten cents per ton royalty was to be paid to Long, the owner, for each ton of coal mined ; the coal seam being about five feet in height, yielding about 5,000 tons to the acre ; the appraisers estimated a reasonable profit on each ton to the operator of ten cents ; this made a profit of $500 per acre when the coal was mined ; the coal yet in the tract, was, therefore, valued at $500 per acre. It does not seem to have occurred to the appraisers that any one purchasing on that valuation, after years of business management and risk, would only get back what he had paid; and unless he made in profit the interest on his investment, would be a heavy loser. The fact is, the value of the coal in place, ten cents per ton, was to be paid to Long, the owner, as it was mined ; to mine it was a business venture running through future years, and depending for its success on many contingencies. It might or might not yield a profit. To enter upon this venture, required an investment of capital in rails, tipples, engines, mules, and other mine equipment at that particular point, a large part of which would be practically valueless, when the coal was mined. The value of

this equipment, at that mine, for the purpose of mining out what remained in that coal tract, was the reasonable value of Sterling No. 1. It brought, at a sale entirely fair and open, $50,000; and, so far as the evidence shows, that was about all it was worth.

The value of the iron property was ascertained by the same unreliable estimate; that is, what net profit by skillful management might be made? The principal sum on which that profit was a fair percentage was adopted as the appraised value. As an illustration, presumably, a blast furnace, with the capacity of those transferred to the Powelton Iron Company, with all the ore, coal and limestone, in proximity to and part of the furnace property, ought to make 500 tons of pig metal per week, which ought to yield a profit of $2.00 per ton, or $1,000 profit per week, or $50,000 per year, and with two furnaces, $100,000 per year, or 5 per cent on $2,000,000; therefore, the value of the plant, with some additional advantages, was over $2,000,000. Where the purchaser, who put in his $2,000,000, was to get his profit, we cannot conjecture. Clearly, having paid $2,000,000, if the money was worth 5 per cent, he would just keep whole. Yet the appraisers seem to have assumed that sane men would invest $2,000,000 in an iron manufacturing enterprise, take all the risks incident to that business in the hope of making 5 per cent profit, when the money was worth that much in other investments, where other men took all the risks. As was to be expected, there was no rush of purchasers, nor any purchaser at that figure.

If Robert Hare Powel, with his exceptional business energy and activity, had survived for many years, and no unlooked for business disaster had overtaken him, having already a large amount of money invested, it is possible he might have added to his estate a sum approximating the values put upon these properties by the appraisers. But, taking the circumstances as they existed when the appraisement was made, they were wholly unwarranted. The assignors were sanguine young men, with but little experience; they took a most hopeful view of the condition of affairs. What to other men, of more experience, seemed a barely possible value, under the most propitious circumstances, to the assignors was a value certain under the then existing circumstances. And they seem to have impressed

their views on the appraisers and creditors, and possibly, to some extent at first, on the assignee. This is the utmost proven by the evidence, as to a fraudulent overvaluation. There is nothing to show the assignee was intentionally a party to this valuation, or even knew how erroneous it was, until months after it was filed. Many of the creditors, among them this appellant, were familiar with some of these properties, if not all of them, and knew the values put on them were purely fanciful, yet filed no exceptions. As the assignees were guilty of no mismanagement in accepting what they were actually worth, in this particular the averments in the petitions are not sustained.

Nor do we find anything in the evidence, in the other averments, which would warrant the court in removing the assignee from the trust. Irregularities, which we will notice in considering the exceptions to the auditor's report, there were, but nothing which calls for anything more than surcharge, if not made clear on settlement of the final account.

That part of the decree imposing the costs upon the petitioners, is not justified by the facts. The findings of the auditor in his second report, and in the interlocutory report, were sufficient grounds on which to base the petitions. And although, on a consideration of the whole evidence, the weight of it is in favor of the respondent, the litigation cannot be properly termed causeless.

As to the complaint of the conduct of the master, in receiving part of his fee from the assignee before his report was filed, there is no evidence that this was other than an indiscretion. That an auditor or master should wait until the end of a prolonged litigation like this, before receiving any part of his compensation, is unreasonable; that he should receive any part of it from one of the parties without the knowledge of the other, or of the court, is, to use the mildest term, unseemly. If he has devoted his time for months to his duty, and the end is not in sight, as here, he has a right to ask a direction of the court for immediate payment of a proportionate part, and then such order can be made as to the court seems proper. But if this, clearly the better way, be not followed, then the payment should be made with knowledge of and by consent of counsel for parties interested.

The course pursued here by the master was exactly that sort of indiscretion which invited upon him the grave imputation put on record in the exception of the appellant. A master ought to be honest, as we believe the master here was; but he ought, also, to appear to be honest.

Therefore, we find as a fact, the material averments of the petitions are not sustained, but that they were not groundless. The decree dismissing them is sustained; so much of it as imposes the costs upon the petitioners is reversed, and it is directed the costs be paid out of the assigned estate.

As to the examiner and master's fee, $5,000, we think the charge excessive. A very large part of the testimony had been taken before the auditor, and typewritten; this had to be read and considered; the time consumed in taking additional testimony, and in making up the report, warrants no such charge as this. One half this sum, or $2,500, we determine to be a reasonable compensation, and that is the sum directed to be allowed him.

This brings us to a consideration of the appeals from the decree overruling the exceptions to the second report of the auditor.

The principal subject of contention, as to the auditor's second report, is his surcharge of the assignee with the appraised value of the iron property, $2,313,318.89, conveyed by the assignee to the Powelton Iron Company. This company was a corporation formed by the creditors for the express purpose of taking a conveyance of this portion of the assets. The creditors were the subscribers for the stock; by the operation of the plant, they expected to make the stock valuable, and thus realize a part of their debts against the assigned estate. The consideration was $900,000, subject to mortgages and liens; and, in addition, the assignee paid to the company $100,000 in cash, which was intended to be a working capital. The Powelton Iron Company gave to the assignee a receipt and discharge of all further liability in respect of the matter. The operation turned out disastrously for the creditors. This, itself, can give the creditors no ground of complaint against the assignee. Before buying the property, they met together, discussed its value, and capabilities; weighed all the advantages and disadvantages of the proposed corporation; then signed the creditor's agreement to

take a conveyance of it; accepted the $100,000 in cash from the
assignee, and launched their enterprise. In a few months, under
their management, the scheme utterly failed. Why should
these creditors, or any of them, seek to surcharge the assignee
with more than twice the agreed value of a property, which
their own management had demonstrated they had paid too
much for? They were not children or lunatics, for whom the
law provides guardians as protectors against improvident bar-
gains; they were grown men, of large business experience;
they had ample opportunity of knowledge concerning the sub-
ject of the contract; most of them knew as much, some of them
more, about the property, than the assignee did. Unless there
be some evidence of fraud or overreaching upon part of the as-
signee, or there be some settled rule of law, in the administra-
tion of such a trust as this one, violated, a court of equity will
be slow to visit such a penalty on a trustee. The auditor finds:
1. That, by the third paragraph of the creditors' agreement, it
was not to go into effect until all the creditors had signed it.
2. That all had not signed it. 3. That the confirmation of the
first account was not an adjudication of this question. 4. That
appellants had done nothing which estopped them from raising
any legal objection at the audit of the second account.

As facts, we find, from the decided weight of the evidence,
that all the known creditors, except those of $350 or less, who
were to be paid in cash, did sign the agreement, except the
First National Bank of Huntingdon. And, as to this creditor,
we find its claim was represented by a third party who professed
to own it; that this was known to the bank, and that it pur-
posely refrained from making its ownership known, that it
might afterwards assert its debt independent of the other cred-
itors, and thus compel payment. It thus kept silent when it
ought to have spoken, and therefore will not be heard now.
It further appears that the Houtzdale Bank was represented
by counsel at the first audit, who knew of the report of the
auditor and its filing; that this report, after exceptions were
filed, was confirmed absolutely, and thus, by a final decree of
the court, this credit was allowed; that Mr. Brisbin, one of the
partners acting for the bank, took part in the meetings of the
creditors leading up to the transfer of the property, and knew
of the payment of the $100,000 by the assignee to the company.

As we have already noticed, in the first account, this trans-fer was distinctly identified by accountant; in the first auditor's report, it was. the subject of consideration and adjudication. The auditor was asked in the interest of all concerned, to make specific findings as to this property, and says: "It has been brought to the attention of the auditor, that the transfer to the Powelton Iron Company by the assignees of the property agreed upon as aforesaid, has been effected several months prior to the filing of this report. The payment of $100,000 to the company appears on the assignee's account filed. The auditor finds that these transfers are absolute, save as limited by the terms of the creditors' agreement referred to. In the ownership of the com-pany, these assets will continue free from the trust of the as-signment, from all claims of creditors, save under the agree-ment reported herewith, and subject only to the mortgage held by the secured creditors, and such other liens of record as may exist, and to the stipulations of said assignment. Should any other creditors hereafter make themselves known, they must have recourse to a later fund in the hands of the assignee, or to the assignors. There is need that these facts be expressly found by the auditor, because the directors of the Powelton Iron Company should know to whom they are accountable for their administration of the corporate property."

Certainly, a question thus passed upon by the auditor, and then settled by a final decree of confirmation by the court, with all the attending circumstances of notice and hearing to appel-lants, ought not to be disturbed without imperative reasons.

As to some of the creditors acting in a fiduciary capacity, having no authority to join in such an agreement, the appellant is not in a position to raise that question. The trustee and his cestui que trusts will be heard at the proper time, when it is raised between them. Those directly interested are not now before us.

But, whatever might have been appellant's right at an ear-lier stage, it is too late to challenge the validity of this transfer after his apparent acquiescence in the first report. The mate-rial facts were then known to him, or might, with reasonable diligence, have been known. As is said in Randolph v. Quid-nick Co., 135 U. S. 457, in a case involving a somewhat similar arrangement by the creditors of the insolvent Sprague

estate : " We do not feel called upon to decide, as a question of absolute law, whether the conveyance was or was not valid beyond challenge. It is enough, for the purposes of this case, that it was with the general acquiescence of the creditors, and that its purpose was equality between them. . . . If they were not satisfied with the legality and equity of the proceedings, they should have antagonized them sooner. Equity loves equality ; and if they did not believe that these proceedings were legal and equitable, they should promptly have invoked the aid of a bankrupt court, or made their assertion of legal right. They might not equitably wait the outcome of the proceedings, expecting to approve if they worked out full payment of all creditors, and ready to attack if the scheme proved a failure."

To the same effect are Guiterman v. Landis, 1 W. N. 622 ; Boyd v. Smith, 128 Pa. 205.

The appellant's 3d, 5th, 6th, 7th and 9th assignments of error all relate to and depend upon the validity of the transfer of the furnace plant to the Powelton Iron Company, and are therefore overruled.

As to the 8th assignment, that is overruled to this extent : It appears that coal seam B, an underlying, undeveloped seam of Sterling No. 1, did not pass to the purchaser of the lease and equipment of the upper seam, but that it remains an unconverted asset. Let the assignee account for this in a future account. It is not discharged from accountability by the fact that the whole property is one item in the inventory. The sale severs that item. A part is now sold and accounted for ; a part remains unsold, and to be accounted for.

The Ramey lease was properly disposed of and accounted for, and therefore the 12th assignment is overruled.

As to the 13th, the decided weight of the evidence shows that Mr. Crawford was of counsel for appellant at the first audit, with his, appellant's knowledge and consent, and as counsel had due notice of the filing of the report.

What we have said, generally, as to the effect of the decrees of confirmation, necessarily disposes of the 4th, 10th, 11th and 14th assignments of error ; they are overruled.

This leaves the parties in this attitude : The assignee, in its second account, claimed a credit for $62,586.06, because, in its

first account, credit to that amount for commissions and coun-
sel fees, in excess of cash on hand, had been taken.   By this
very act, the accountant, in effect, admitted there had not been
a final adjudication of it; that the payment had not been in
fact executed as represented in the first account.   The auditor
concludes that, to the amount of $62,586.06, this credit "must
be regarded as unadjudged."   We concur with him in this con-
clusion, and sustain the 1st and 2d assignments of error.   The
decree of the court sustaining exceptions of assignee to second
report of the auditor in this particular is reversed.   And this
is the only question remaining open to further litigation, as to
items embraced in the two accounts filed; and as this claim of
credit is not yet res adjudicata, it is the duty of the court below
to appoint an auditor to pass upon the legality and reasonable-
ness of the charges of the assignee for counsel fees and com-
missions, and to distribute any balance in hands of assignee.
This reasonableness is to be determined from proper proof ad-
duced before him.   That ought not to be fixed on the large ap-
praised value of the assigned estate, without regard to its real
value.   True, the extent of responsibility is an element in ar-
riving at what is a reasonable charge.   But there are to-day mil-
lions of stocks and bonds not worth five cents on the dollar;
an assignment of such assets involves very little responsibility
on part of the trustee, and it would be unjust to creditors to
measure compensation by the nominal value.   Nor is the as-
signee entitled to double compensation in any case; if duties
usually performed by an assignee personally, have been dele-
gated to lawyers and agents, and compensation has been al-
lowed for their services, it cannot again charge for such service,
as if rendered by itself.   It is the duty of the courts, in every
trust account, to rigidly scrutinize all charges for compensation,
and to prevent the depletion of trust funds from excessive
charges by either trustees or counsel.

All creditors' claims on the fund, in a sense, are antagonistic
to the trustee.   It is his duty to see that they are properly
proven and to resist payment of all unfounded demands.   He
should not be represented by counsel who have adverse claims.

As to the complaints, put of record here, against the learned
judge of the court below, we can discover nothing to warrant
them, in the evidence before us.   The character of the litiga-

tion and the temper of counsel may exhaust even the patience of a judge, as they possibly did here. The court had other cases to try, and other suitors anxious for a hearing; this probably did not occur to counsel for appellant, and therefore he attributes the adverse judgment to a neglect to fully hear, rather than to a weakness of his cause in the several important particulars we have noticed.

The record is remitted to the court below, to be proceeded in to final decree in accordance with this opinion; the record costs of these appeals to be paid out of the fund.

SOUTHWESTERN NATIONAL BANK'S APPEAL.

OPINION BY MR. JUSTICE DEAN, Oct. 1, 1894:

All the questions raised by this appeal, have been passed upon in the Appeal of the Houtzdale Bank from the same decrees, opinion filed this day. The record is therefore remitted to the court below to be proceeded in to final decree in accordance with that opinion, the record costs of this appeal to be paid out of fund in hands of assignee.